UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
**12 CIV 1902 (VSB)**

X-------------------------------------------------X

LARRY NADEL,

Plaintiff,

-against-

ERIC K.SHINSEKI, SECRETARY,
DEPT. OF VETERANS AFFAIRS,

Defendant.

X-------------------------------------------------X

MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated:      New York, New York
            February 26, 2014          Respectfully Submitted,


            /Stewart Lee Karlin
            _____
            STEWART LEE KARLIN, ESQ.
            Attorney for Plaintiff
            9 Murray Street, Suite 4-W
            New York, New York 10007
            (212) 792-9670

TO:   Patricia L. Buchanan
      United States Attorneys Office
      via ECF

# TABLE OF CONTENTS

`                                                                                     **Page**

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i-ii

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-V

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-25

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Factual Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-5

1.      Plaintiff's Job at the Department of Veteran's Affairs. . . . . . . . . . . . . . . . . . . . . . . . . 1

2.      Plaintiff's Disability and Perceived Disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

3.      Discrimination due to Disability and Perceived Disability. . . . . . . . . . . . . . . . . . . . . 2-3

4.      Plaintiff's Protected Activity and Discrimination due to his Disability. . . . . . . . . . . . 3-4

5.      Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

6.      Plaintiff's Termination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-25

POINT I
THE STANDARDS FOR SUMMARY JUDGMENT MANDATE THAT
DEFENDANT HAS THE BURDEN OF SHOWING THAT THERE ARE
NO GENUINE MATERIAL ISSUES OF FACT AND PLAINTIFF IS
ENTITLED TO ALL FAVORABLE INFERENCES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

POINT II
THERE ARE MATERIAL TRIABLE ISSUES OF FACT REGARDING
PLAINTIFF'S DISCRIMINATION CLAIMS THAT PRECLUDE A
JUDGMENTFOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1.      Plaintiff has established a prima facie case of discrimination. . . . . . . . . . . . . . . . . . . . 6

2.      Defendant's discriminated Plaintiff for being disabled or for

**Page**

having a perceived disability.  At the very least, material issues
of fact exist that preclude summary judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11-13

3.      Plaintiff was subjected to disparate treatment due to his disability. . . . . . . . . . . . . .   13-19

4.      Defendant has not articulated legitimate non-discriminatory reasons for its actions since
        Plaintiff's performance deficiency is in dispute as Micalizzi wanted to terminate him
        after he took a leave of absence of 3 months due to his injury. . . . . . . . . . . . . . . . . .   19-21

5.      Plaintiff disputes the contents of his termination letter. . . . . . . . . . . . . . . . . . . . . . . .   21-23

POINT III
PLAINTIFF WAS RETALIATED AGAINST FOR COMPLAINING
OF DISABILITY AND PERCEIVED DISABILITY DISCRIMINATION. . . . . . . . . . . . . .   23-25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

## <u>TABLE OF AUTHORITIES</u>

**Case**                                                                                                    **Page**

<u>Ang v. Procter & Gamble Co.</u>,

    932 F.2d 540, 548 (6th Cir.1991);;. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>Albertson's, Inc. v. Kirkingburg</u>,

    527 U.S. 555, 566 (1999);. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

<u>Celotex Corp. v. Catrett</u>;

    477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986);.. . . . . . . . . . . . . . . . 5

<u>Clark v. Coats & Clark, Inc.</u>

    929 F2d 604, 608 (11th Cir. 1991);. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>Doe v. Pfrommer</u>,.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    148 F.3d 73, 82 (2d Cir.1998);

<u>Doherty v. Southern College of Optometry</u>,

    86 F.2d 570, 573 (6th Cir.1988), 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) . . . 7

<u>Gagne v. Northwestern Nat'l Ins. Co.</u>,

    881 F.2d 309, 313 (6th Cir.1989);. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>Jasany v. United States Postal Serv</u>.,

    755 F.2d 1244 (6th Cir.1985);. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>Maddox v. University of Tennessee</u>,

    62 F.3d 843, 846 1178*1178n. 2 (6th Cir.1995);.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>Manzer v. Diamond Shamrock Chemicals Co.</u>, ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    29 F.3d 1078 (6th Cir.1994);

**Case**                                                                                    **Page**

McDonnel Douglas Corp. v. Green,

 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824-25, 36 L.E.2d 668 (1973); . . . . . . . . . . . 8, 23

McGuinness v. Lincoln Hall,

 263 F.3d 49, 53 (2d Cir.2001); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Mushita Electric Industrial Co. v. Zenith Radio Corp.

 475 U.S. 574, 586-87, 106 S.Ct. 1328, 1355-56, 89 L.Ed. 2d 538 (1086); . . . . . . . . . 5,6

LeBlanc,

 67 F.3d at 425; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Prewitt v. United States Postal Serv.,

 662 F.2d 292 1179*1179 (5th Cir.1981); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Pushkin v. Regents of the Univ. of Colorado,

 658 F.2d 1372 (10th Cir. 1981); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Quinn v. Green Tree Credit Corp.,

 159 F.3d 759, 769 (2d Cir.1998); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Rizzo v. Children's World Learning Centers, Inc.,

84 F.3d 758, 761 (5th Cir.1996); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 8

Schnabel,

232 F.3d at 87; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Suburban Propane v. Proctor Gas, Inc.,

 953 F.2d 780, 788 (2d Cir.1992); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Sutton v. United Airlines,

 527 U.S. 471, 483 (1999); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

**Case**                                                                 **Page**

St. Mary's Honor Ctr. v. Hicks,

    509 U.S. 502, 506-07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); . . . . . . . . . . . 8,9

Taub v. Frank,

    957 F.2d 8, 10 (1st Cir.1992; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Trans-Orient Marine Corp v. Star Trading & Marine, Inc.

    925 F.2d 566, 572 (2d Cir.1991); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Tomka v. Seiler Corp.,

66 F.3d 1295, 1308 (2d Cir.1995)); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Diebold Inc.,

    369 U.S. 654 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Weg v. Macchiarola,

    995 F.2d 15, 18 (2d Cir.1993); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

White v. York Int'l Corp.

    45 F.3d 357, 360-61 (10th Cir.1995); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8


**Laws**

Americans with Disabilities Act and Rehabilitation Act; . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Rehabilitation Act of 1973, 29 U.S.C. § 794 (1995); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Fed.R.Civ.P. 56 (c); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

29 U.S.C. § 701; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
LARRY NADEL,

                    Plaintiff,

           -against-

ERIC K.SHINSEKI, SECRETARY,
DEPT. OF VETERANS AFFAIRS

                  Defendant.
--------------------------------------------------X

               **12 CIV 1902 (V.B.)**

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Introduction

Plaintiff, LARRY NADEL, through undersigned counsel, submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.  The Court is referred to Plaintiff's and Counsel's declarations, and Rule 56.1 response for the complete factual statement.

### Factual Statement

**1.  Plaintiff's Job at the Department of Veteran's Affairs**

Plaintiff started to work at the Department of Veteran's Affairs ("VA") as a probationary Accountant GS-11 in April 2010.  Plaintiff performed his duties satisfactorily and was in training before he suffered his injury.  Plaintiff worked for 8 weeks and then became disabled.  Due to his disability, Plaintiff was not able to work for 3 months.  Before Plaintiff became disabled, no one ever complained about his performance.  See Plaintiff's Declaration ¶ 2-23.

**2.  Plaintiff's Disability and Perceived Disability**

On June 22, 2010, less than two months into Plaintiff's employment, he injured his knee, requiring surgery.  Speicifically, Plaintiff ruptured his left knee patellar tendon.  Exh. B at p. 88-

1

89, Defendant's Exh. F.  Due to this, Plaintiff was absent from duty for three months due to rehabilitation.  Due to this injury, Plaintiff's major life activities were adversely affected as he could not walk, or perform several manual tasks.  In addition to not being able to walk, Plaintiff could not perform other major basic day to day activities such as showering and driving. Plaintiff had to be assisted at all times.  Plaintiff also suffered from insomnia.  Plaintiff's disability continued to affect his major life activities as Plaintiff still needed assistant to do to the simplest things.  Everyone at work knew that Plaintiff was disabled or had a perceived disability because he was absent for three months and when he came back many people asked him how his knee was, as well as his health status.  In addition, Plaintiff could not perform simple manual tasks at work such as moving boxes in the office.  Plaintiff was the only person at work unable to perform this task.  Also, upon Plaintiff's return to work, he walked with a cane and had a noticeable limp. Thus, it would have been impossible for other people at the VA not to have observed Plaintiff's disability. Id., Exh. "B" at p.102; Plaintiff's Declaration ¶ 24-27.

### 3.  Discrimination due to Disability and Perceived Disability

Due to Plaintiff's disability and perceived disability, an adversarial workplace was created towards Plaintiff.  Plaintiff was discriminated and then went to the EEOC.  Thereafter, Plaintiff was retaliated against.  Exh. "B", p.97.  Specifically since the time Plaintiff got injured to the time of Plaintiff's termination, it became evident that Ms. Angela Micalizzi did not want Plaintiff to be an employee of the VA.  Exh. "B", p.98.  Plaintiff met all expectations of his employment prior to his injury.  Plaintiff only worked for the VA for about 8 weeks before Plaintiff suffered his knee injury.  After Plaintiff was injured and returned to work following his three month absence, Plaintiff's immediate supervisor, Micalizzi's attitude towards him abruptly changed.  First, the day of the injury, Plaintiff had his wife call Micalizzi to notify his employer

about the injury.  Plaintiff asked his wife to call because he was heavily sedated and not able to speak over the phone.  Even though this was explained to Micalizzi, she refused to talk to Plaintiff's wife and told her that "she does not accept calls from spouses or significant others" and that Plaintiff had to call.  Exh "A" ¶ 9.   Plaintiff was heavily sedated and was unable to make the call.  On or about September 29, 2010, Plaintiff returned to work.  After a continuous pattern of harassment, in October 29, 2010, Plaintiff wrote a letter to Veronica Foy, whom Plaintiff perceived to be Micalizzi's boss subjected "Harrassment by Angela Micalizzi".  Exh. "B", p. 14.  In the letter, Plaintiff indicated at least 8 particular incidents of harassment.  See Defendant's Exhibit "H".

### 5. Plaintiff's Protected Activity and Discrimination due to his Disability

On or about November 10, 2010, Plaintiff filed a complaint of employment discrimination with the VA's EEO Office (the "EEO complaint").  Ex. H, US0413-437. In the complaint, Plaintiff attached the letter written to Veronica Foy. The first incident described was the incident when Micalizzi demanded to speak to Plaintiff and refused to speak to his wife although he was heavily sedated.  Plaintiff was also accused of not working satisfactorily.  Exh. "A" ¶ 9(1).  The third incident involved Micalizzi chastising Plaintiff about not getting new passwords, even though Plaintiff had obtained them. Plaintiff got a password on the day that was indicated to Plaintiff which was October 1, 2010.  The fourth incident involved Micalizzi telling him that he would not be getting help anymore, when in fact he had only worked in the position for 8 weeks before he took a leave due to his injury. Exh. "A"  ¶ 9, (5),(6).  The fifth incident occurred on October 6, 2010 (only a day after incident No. 4 above).  Micalizzi continued to attack Plaintiff and started comparing him to lower level employees as GS 4.  The sixth incident Plaintiff listed in his complaint involved an e-mail message in October 20, 2010 where Micalizzi

accused him of not submitting electronically his leave for time he was out. Pl's Dec.¶ 62-63. The seventh incident concerned a meeting between Micalizzi and Plaintiff on October 21, 2010 in Micalizzi's office (a day after incident six, and again within days of his return to work).   At the meeting, Ms. Micalizzi would not accept nor thought it relevant the amount of invoices that Plaintiff resolved and again brought up her charges that the June WIP report was not completed in time.   Micalizzi shot back "you're ridiculous.   The eighth incident concerned a meeting between Micalizzi and Plaintiff on October 26, 2010.   At the meeting (again less than a month after Plaintiff's return), Micalizzi ordered Plaintiff to perform some work on invoices that would take 20 minutes per invoice to accomplish. She told Plaintiff that each invoice should only take 5 minutes. When Plaintiff asked how to complete them in that amount of time Micalizzi refused to answer and told him that, "she would ask the questions." Exh. "A" ¶ 9(8).

### 4.   Retaliation

After Plaintiff formally complained of discrimination on November, 2011, he was retaliated against. Shortly after complaining, Plaintiff received a warning letter from Micalizzi in January 2011.   At that point, Plaintiff knew that this was in direct response to his complaint and that Micalizzi wanted to terminate him.   Exh. "B", p. 215.   On January 7, 2011, Angela Micalizzi issued a written counseling memo to Plaintiff regarding his performance.   See Defendant's Exh. K. In the counseling memo, Plaintiff was accused of not performing his duties.   These accusations were false and were made in an attempt to justify Defendant's pretextual reasons to terminate me later on.   Plaintiff contests every single allegation against him listed in the counseling memorandum.   See Pl.'s Dec. ¶52-66.

### 5.   Plaintiff's Termination

On April 13, 2011, Plaintiff was terminated for pretexual reasons as a result of the

Defendant's discriminatory practices.  Exh "A" ¶ 9 (9), Defendant's Exh. "L" and "M".  The stated reasons are pretexual to mask a discriminatory and retaliatory intent.  Plaintiff alleges every single reason stated in his termination letter inaccurate and he was blamed for errors of others.  See Pl.'s Dec. ¶52-98.  Due to Defendant's actions, Plaintiff has been unable to secure a job and has been unemployed since his termination despite his multiple attempts to find other employment.  Plaintiff is depressed and has trouble sleeping.  Exh "B" p.262-267, p. 275.

**ARGUMENT**

**POINT I**

**THE STANDARDS FOR SUMMARY JUDGMENT MANDATE THAT
DEFENDANT HAS THE BURDEN OF SHOWING THAT THERE
ARE NO GENUINE MATERIAL ISSUES OF FACT AND
PLAINTIFF IS ENTITLED TO ALL FAVORABLE INFERENCES**

In connection with a motion for summary judgment, the Court's function is to determine whether a material factual issue exists, not to resolve any existing factual issues.  United States v. Diebold Inc., 369 U.S. 654 (1962).  A court may grant summary judgment under Fed.R.Civ.P. 56 (c) only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  Where, as here, the non-movant bears the ultimate burden to prove at trial that the Defendant discriminated, she may defeat the summary judgment motion by procuring sufficient specific facts to establish that there is a genuine issue of material fact for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exists genuine issues of material facts.  Matushita Electric Industrial Co. v. Zenith Radio Corp. 475 U.S. 574, 586-87, 106 S.Ct. 1328, 1355-56, 89 L.Ed. 2d 538 (1086);  Clark v. Coats & Clark,

5

Inc. 929 F2d 604, 608 (11th Cir. 1991).   Summary judgment is proper only when, "viewing the evidence in the light most favorable to the non-movant, the court can determine that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.   Weg v. Macchiarola, 995 F.2d 15, 18 (2d Cir.1993), quoting  Suburban Propane v. Proctor Gas, Inc.,953 F.2d 780, 788 (2d Cir.1992).   The Court must resolve all ambiguities and draw all doubtful inferences against the moving parties.   Trans-Orient Marine Corp v. Star Trading & Marine, Inc. 925 F.2d 566, 572 (2d Cir.1991).

<u>**POINT II**</u>

**THERE ARE MATERIAL TRIABLE ISSUES OF FACT REGARDING
PLAINTIFF'S DISCRIMINATION CLAIMS THAT PRECLUDE A
JUDGMENTFOR SUMMARY JUDGMENT**

It is well settled that summary judgment is not an appropriate remedy whenever there are outstanding issues of fact which require resolution by a jury.  This is precisely the case at bar. Here material triable issues of fact exist regarding Plaintiff's discrimination claims which preclude summary judgment.  Plaintiff has demonstrated a prima facie case and that the reasons for Defendant's termination were pretextual, or that at the very least, there are issues of fact that are appropriate for a trier of fact, not of law.  Since these questions are to be resolved by a jury, Plaintiff requests denial of Defendant's Motion for Summary Judgment.

1. **Plaintiff has established a prima facie case of discrimination**

The Rehabilitation Act of 1973 prohibits discrimination against qualified individuals with disabilities who work in the federal government.  The Department of Veterans Affairs is a government-run institution that receives federal funds; as such its labor practices are subjected to the Rehabilitation Act of 1973.  Under the Rehabilitation Act of 1973, no otherwise qualified individual with a disability in the United States, as defined in section 705 (20) , shall, solely by

reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 701.  Under this act, a person is considered to have a disability if he has a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. 5 (20).  Whether a person has a disability under the ADA is an individualized inquiry. Sutton v. United Airlines, 527 U.S. 471, 483 (1999).  The Court should determine the existence of disabilities on a case-by-case basis.  Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999).   Among major life activities are disabilities and injuries that impede walking and performing manual tasks.  Id. Inability to sleep is another major life activity.

The analysis of claims under the Americans with Disabilities Act roughly parallels those brought under the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1995).Maddox v. University of Tennessee, 62 F.3d 843, 846 1178*1178 n. 2 (6th Cir.1995).  To recover on a claim of discrimination under the Act, a plaintiff must show that: 1) he is an individual with a disability; 2) he is "otherwise qualified" to perform the job requirements, with or without reasonable accommodation; and 3) he was discharged solely by reason of his handicap.  Maddox, 62 F.3d at 846 (relying  on Doherty v. Southern College of Optometry, 86 F.2d 570, 573 (6th Cir.1988) (Rehabilitation Act claim), cert. denied, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989), to analyze claims brought under Americans with Disabilities Act and Rehabilitation Act); accord Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 761 (5th Cir.1996); White v. York Int'l Corp., 45 F.3d 357, 360-61 (10th Cir.1995); Taub v. Frank, 957 F.2d 8, 10 (1st Cir.1992)(Rehabilitation Act claim).  In cases in which the plaintiff alleges that he or she is the victim of discriminatory treatment, a plaintiff may attempt to establish unlawful discrimination by introducing direct evidence or (Rizzo at 761; White, 45 F.3d at 361 n. 6), or by

introducing indirect evidence of discrimination to shift the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for making the adverse employment decision. See Rizzo, at 761.  Defining and applying an appropriate framework for analyzing claims of discrimination based on an individual's disability has proven to be a difficult task. Courts have applied, in some cases involving a claim of discriminatory treatment on the basis of a disability, a burden-shifting analysis roughly equivalent to that set forth by the Supreme Court in McDonnel Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824-25, 36 L.E.2d 668 (1973).  See also Jasany v. United States Postal Serv., 755 F.2d 1244 (6th Cir.1985); Prewitt v. United States Postal Serv., 662 F.2d 292 1179*1179 (5th Cir.1981); Pushkin v. Regents of the Univ. of Colorado, 658 F.2d 1372 (10th Cir. 1981).  Applying the McDonnell Douglas formula, where no direct evidence of discrimination exits, a plaintiff may establish a prima facie case of discrimination by establishing that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment decision; and (4) the adverse decision occurred under circumstances giving a rise to an inference of discrimination (i.e. he was replaced by a member outside the protected class). Ang v. Procter & Gamble Co., 932 F.2d 540, 548 (6th Cir.1991) (relying  on Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 313 (6th Cir.1989), and McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824). If the plaintiff is able to establish a prima facie case of discrimination, the burden of production then shifts to the employer to assert a legitimate, non-discriminatory justification for its action. Id. If the employer fails in this burden of production, the plaintiff need not introduce any other evidence of discrimination, and a mandatory inference of discrimination must be drawn by the fact finder. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). However, once the employer has come forward with evidence of a legitimate reason for

8

its action, the inference shifts from a mandatory one the fact finder must draw, to a permissive one the fact finder may draw, and the burden shifts back to the employee to establish that the employer's proffered explanation is a mere pretext for unlawful discrimination. Id. At 510-11, 113 S.Ct. at 2749; Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078 (6th Cir.1994).

Plaintiffs who allege violations under the ADA, the FHA, and the Rehabilitation Act may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation. See Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir.1998) (noting the possible application of these three theories under the ADA and the Rehabilitation Act). "Discriminatory intent may be inferred from the totality of the circumstances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision [and] contemporary statements by members of the decision making body...." LeBlanc, 67 F.3d at 425 (citations and internal quotation marks omitted). To defeat summary judgment, plaintiffs can introduce sufficient evidence from which a reasonable juror could conclude that the plaintiffs made out a prima facie case. **Their initial burden of production under the *McDonnell Douglas* analysis is "minimal."** St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); 50*50; McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir.2001).

In the case at hand, Plaintiff has established a prima facie case of disability discrimination under the Rehabilitation Act because (1) he is a member of a protected class because he suffered a knee injury that rendered him disabled and due to this he was out of work for 3 months and when he came back to work was not fully recovered since he used a cane to walk (Exh. B at p. 88-89, Def.'s Exh. F-Letters from Ronald Light, M.D., Bates US0400 and US0426).  Plaintiff also has a difficulty sleeping which is a major life activity.  Pl.'s Dec. ¶ 98;

(2) he was qualified for the position, as he was an accountant with a qualified educational background and vast experience working as an accountant before becoming employed by the VA (Exh. "B", p.14-20); (3) he suffered an adverse employment decision since after Micalizzi (Plaintiff's supervisor) found out that he became disabled, she abruptly changed with him and papered his file in an effort to terminate him and indeed terminated him due to his disability and as a result of his protected activity [EEOC complaint. Exh. "A" ¶8-14; Exh. "B"97-98, 103-105,128, 166-167, 202. Lastly, (4) the adverse decision to terminate Plaintiff occurred under circumstances giving a rise to an inference of discrimination because prior to his disability, Plaintiff was never advised of any performance deficiencies. Immediately after Plaintiff suffered an injury, Micalizzi (Plaintiff's supervisor) abruptly changed and created a hostile work environment towards Plaintiff. Among the things she did was to call Plaintiff ridiculous, yell at him, humiliate him, tell him that he made too many mistakes (without providing training or explaining what was needed from Plaintiff), accuse him of not performing his job or submitting reports that were already submitted, etc. In addition, Plaintiff was blamed for any minor mistake, which worked adversely against him. However, other employees who work with Plaintiff such as Halima Khan and Jing Cheng who were in a similar position as Plaintiff were not punished nor criticized for their mistakes as Plaintiff was. These individuals did not suffer from any disability like Plaintiff did. Yet, when Plaintiff was fired, he was replaced by Kalima Khan who has no disability. See Exh. "A" ¶ 10-14, Exh. "C" 76 and Defendant's Ex. H, US0413-437.

Therefore, given the above established facts and that under the summary judgment standard all inferences are to be viewed in favor to the non-moving party (here the Plaintiff), summary judgment cannot be granted in this case. Even if Defendant disputes every single fact

as stated above, because all of the above are material issues of fact in Plaintiff's disability discrimination claim, that is sufficient to preclude summary judgment.  The question and issues presented in this case are appropriate for a jury as they are not questions of law, but questions of fact.  Accordingly, Defendant's motion for summary judgment should be denied.

**2. Defendant discriminated Plaintiff for being disabled or for having a perceived disability.  At the very least, material issues of fact exist that preclude summary judgment**

Under the Rehabilitation act, a person is considered to have a disability if he has a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. §705 (20).    Whether a person has a disability under the ADA is an individualized inquiry.  <u>Sutton v. United Airlines</u>, 527 U.S. 471, 483 (1999).  The Court should determine the existence of disabilities on a case-by-case basis.  <u>Albertson's, Inc. v. Kirkingburg</u>, 527 U.S. 555, 566 (1999).  Among major life activities are disabilities and injuries that impede walking and performing manual tasks.  <u>Id</u>. Inability to sleep is another major life activity.  In <u>Albertson's, Inc. v. Kirkingburg</u>, the Court stated that there was a "statutory obligation to determine the existence of disabilities on a case-by-case basis." It added that "[t]he Act expresses that mandate clearly by defining 'disability' 'with respect to an individual,' 42 U.S.C. § 12102(2), and in terms of the impact of an impairment on `such individual,' § 12102(2)(A).  <u>Albertson's, Inc. v. Kirkingburg</u>, 527 U.S. 555, 566 (1999),

In the case at hand, on June 22, 2010, two months into Plaintiff's employment, Plaintiff injured his knee, requiring surgery.  Plaintiff ruptured his left knee patellar tendon which rendered him unable to walk.  Exh. B at p. 88-89, Def.'s Exh. F (Letters from Ronald Light, M.D., Bates US0400 and US0426).  Due to this injury which impacted one of his major life activities (walking), he had to be absent from duty for three months.  Plaintiff was unable to

return to work immediately after the injury and required extensive rehabilitation. Plaintiff's major life activities were adversely affected such as walking and performing several manual tasks. In addition to not being able to walk, Plaintiff could not perform other major basic day to day activities such as showering and driving. He had to be assisted at all times. Pl's Dec. ¶ 22. Due to his disability, Plaintiff was absent from duty for three months. Id. Thus, the argument that Plaintiff does not meet the meaning of disability under the rehabilitation act is out of place as the injury ruptured Plaintiff's patellar tendon which rendered him unable to walk which under the statute is a major life activity.

Furthermore, three months after his extensive rehabilitation, Plaintiff returned to work. At the time of his return, Plaintiff was unable to walk properly and required a cane. Plaintiff had an obvious limp. Exh. "B" at p.102. Plaintiff's disability continued to affect his major life activities as Plaintiff still needed assistant to do to the simplest things. The VA was aware of Plaintiff's disability as Plaintiff's wife called Micalizzi the same day of the accident to tell her what had occurred. Micalizzi refused to talk to Plaintiff's wife and told his wife that "she does not accept calls from spouses or significant others" and that Plaintiff had to call. Exh. "A" ¶ 9; Defendant's, Ex. H, US0418. Plaintiff was about to go to surgery and could not talk. Plaintiff's Declaration ¶ 34. Nevertheless, Plaintiff contacted Micalizzi whenever he had a chance to. Plaintiff also provided medical documentation to the VA and submitted a leave of absence due to his disability. Id. Specifically, Plaintiff provided two letters from Ronald Light, M.D., one dated September 1, 2010 (Def.'s Exh. "F", Bates US0400) and the other one dated September 28, 2010 (Def.'s Exh. "F" Bates US0426). Moreover, upon his return to work in September, Plaintiff carried a cane for several weeks but it did not adversely affect his ability to perform his accounting duties. Exh. "A" ¶ 7. Plaintiff's disability however, continued to affect major life

activities as he still needed assistant to do to the simplest things.  Further, other employees of the VA knew of Plaintiff's disability or that Plaintiff had a perceived disability because Plaintiff was absent for three months and when he came back many people asked how his knee was, as well as his health status.  In addition, Plaintiff couldn't perform simple manual tasks at work such as moving boxes in the office.  Plaintiff was the only person at work unable to perform this task. Pl.'s Dec. ¶ 24-26.  Lastly, upon his return to work, Plaintiff walked with a cane and had a noticeable limp. Id., Exh. "B" at p.102.  Thus, it would have been impossible for other people at the VA not to have observed Plaintiff's disability even if he was not to mention it.  Pl.'s Dec. ¶ 27; Exh. "A" ¶ 7, Exh. "B" at p.102.  Therefore, it cannot be said that Plaintiff did not have a disability or that he was not perceived to be disabled by others.  The fact that Plaintiff was able to perform his accounting duties, which Defendant concedes (Def.'s Memorandum p. 10-11), strengthens Plaintiff's case as it is one more reason to show that his termination was pretextual. However, Plaintiff's disability did affect one of his major life activities under the Rehabilitation Act as set forth and thus he is covered by the statute.  Lastly, due to the discriminatory treatment he was subjected to, Plaintiff is depressed and has trouble sleeping, which also impacts his major life activities.  Pl.'s Dec., ¶ 98.

Thus, the argument that Plaintiff does not meet the disability requirement is misplaced. Even assuming *arguendo* that Defendant would wish to dispute this fact, this will be a material issue of fact that once again will preclude summary judgment.

### 3.  Plaintiff was subjected to disparate treatment due to his disability

In the case at hand, Plaintiff met all expectations of his employment prior to his injury and after he returned to work.  Exh. "A" ¶ 8.  Plaintiff only worked for the VA for about 8 weeks before he suffered his knee injury.  However, after Plaintiff was injured, Micalizzi's attitude

13

towards Plaintiff abruptly changed.  Micalizzi did everything in her power to terminate Plaintiff by creating an adversarial work environment and by providing pretextual reasons for his termination.

On or about September 29, 2010, Plaintiff returned to work.  Thereafter, Micalizzi would constantly accuse Plaintiff of not doing things.  Among the things Micalizzi accused Plaintiff of were not submitting medical documentation when Plaintiff actually submitted 2 doctor's letters (Def.'s Exh. "H").  Micalizzi also told Plaintiff that his doctor's letters were not sufficient although this is not a determination to be made by her but by H.R.  This again showed her bad faith.  Additionally, Plaintiff was blamed for errors committed by others at the time Plaintiff was out for his disability.  See also POINT II sec. 4-5. For instance, Plaintiff was blamed for the errors in WIP reports which were prepared by others during his absence.  These errors for which Plaintiff was blamed were cited in Micalizzi's recommendation to terminate Plaintiff and in Plaintiff's termination letter which again shows Defendant's bad faith and that Plaintiff's termination was pretextual.  Pl.'s Dec. ¶ 32-45.  See also POINT II, sec 4-5.

Micalizzi also never trained Plaintiff, despite being aware that he had been working only for about 8 weeks before he suffered his injury.  Plaintiff was also constantly accused of doing the wrong thing.  Pl.'s Dec. ¶ 46-47, Exh. "B" p.103..  When Plaintiff then asked her, "what would you like me to do, how could I correct that?" Micalizzi replied to him "I'm not going to tell you that, figure it out" Exh. "B", p. 103.  This was pretty much her answer for any question Plaintiff had in which she always used an accusatory and rude tone of voice.  Plaintiff knew that Micalizzi was piling up content in his personnel file in order to terminate him.  The impetus for Micalizzi's actions was obvious because the discrimination Plaintiff suffered happened immediately after Plaintiff suffered his disability or perceived disability.  For instance, although

14

Micalizzi alleged that Plaintiff's performance was deficient, she never documented these alleged deficiencies until after Plaintiff became disabled.  Only then did she conveniently put her alleged concerns in writing.  Pl.'s Dec. ¶ 47-49, See also Exh "C".  p. 36.  After a continuous pattern of harassment, in October 29, 2010, Plaintiff wrote a letter to Veronica Foy, whom Plaintiff perceived to be Micalizzi's boss subjected "Harrassment by Angela Micalizzi".  Exh. "B", p. 14. In the letter, Plaintiff indicated at least 8 particular incidents of harassment. Def.'s Exh. "H"; Pl.'s Dec. ¶ 50-51.  The eight incidents were just some of many other incidents of discrimination. Micalizzi constantly discriminated, humiliated and harassed Plaintiff at work.  Pl.'s Dec. ¶ 51.

On or about November 10, 2010, Plaintiff filed a complaint of employment discrimination with the VA's EEO Office (the "EEO complaint").  Ex. H, US0413-437. In the complaint, Plaintiff attached the letter written to Veronica Foy. The first incident described was the incident when Micalizzi demanded to speak to Plaintiff and refused to hear from Plaintiff's wife although he was heavily sedated.  Exh "A" ¶ 9 (1); Def.'s, Ex. H, US0418.  This was obviously an emergency and Plaintiff was unable to speak.  After Plaintiff got injured, his wife immediately called Micalizzi as soon as she could and told Micalizzi about the emergency. Micalizzi didn't even ask how Plaintiff was.  Instead **Micalizzi was very hostile towards Plaintiff's wife and refused to listen to her.  Micalizzi only wanted to speak with Plaintiff; however Plaintiff was physically unable to do this because as his wife explained to Micalizzi, he was heavily sedated and about to go to surgery.  Micalizzi did not seem to care.**  Pl.'s Dec. ¶ 54.  The second incident involved Micalizzi complaining repeatedly about insufficient doctor's notes and leave requests, although Plaintiff complied with all requirements. Exh "A" ¶ 9 (2).  This was despite the fact that I had submitted two doctor's notes from Ronald Light, M.D., one dated September 1, 2010 (Def.'s Exh. "F", Bates US0400) and the other one

dated September 28, 2010 (Def.'s Exh. "F" Bates US0426).  This showed Micallizzi's bad faith since she is not the person in charge to judge the sufficiency of doctor's note.  It is HR's job to do this finding, not Micallizzi's job.  Pl.'s Dec. ¶ 55.  Micalizzi also directly asked Plaintiff whether it was his intention to resign and often used an unreasonable tone.  Def.'s Ex. H, US0418.   The third incident involved Micalizzi chastising Plaintiff about not getting new passwords, even though he had obtained them. Exh "A" ¶ 9 (4); Exh. "B" p. 154; 158-160. Specifically, Plaintiff got a password in the day that was indicated to him which was October 1, 2010.  In addition Plaintiff started working in his computer on October 1, 2010.  However, by October 05, 2010, Plaintiff was already called in by Micalizzi.  This made no sense to Plaintiff, especially because Plaintiff was working with the computers for only *two days* (October 1, 2010 was a Friday) before Micallizzi chastised him and called him to her office on October 5, 2010. Pl.'s Dec. ¶57. This once more shows that Micalizzi acted with bad faith towards Plaintiff because of his disability and indicates a causal connection between her discrimination and Plaintiff's termination as she was merely establishing an unlawful pretext in an effort to terminate me.  See Also POINT II, sec. 4.  Pl.'s Dec. ¶ 57.

The fourth incident involved Micalizzi telling Plaintiff that he would not be getting help, when in fact Plaintiff had only worked in the position for 8 weeks before he took a leave due to his injury. Exh. "A"    ¶ 9, (5),(6).  Specifically, on October 5, 2010 Micalizzi called Plaintiff in and told him that his "past work effort was questioned".   Plaintiff found this odd since Plaintiff was back at his job for less than a week, and he was being criticized for it. Plaintiff never received a complaint regarding his performance during his first 8 weeks of work before he got injured.  Pl.'s Dec. ¶ 58.  In addition, it is important to emphasize that Plaintiff was working for only 8 weeks before his disability and he was still in training.  On October 05, 2011, Micalizzi

also told Plaintiff that he "shouldn't need help since he was a grade 11."  Also, as part of the same discussion, Micalizzi stated that a June 2010 WIP report was not completed in time. Defendant's Exh. H, US0418-19.  Pl.'s Dec. ¶ 59-60.  Plaintiff was accused of not completing the WIP report; however this report was due before his injury and had been completed in time. Exh. "A"     ¶ 9, (5),(6); Pl.'s Dec. ¶ 59-60.   In the fifth incident complained of occurred on October 6, 2010 (only a day after incident No. 4 above).  Plaintiff described Micalizzi's continuous attacks and that Micalizzi started comparing Plaintiff to lower level GS 4 employees. Plaintiff felt insulted and humiliated.  Exh. "B", p. 166-167.

After Plaintiff returned to work, Micalizzi always refused to train him or provide him any guidance whatsoever.  If Plaintiff had a question, her reply was always to say"figure it out!" in a bad tone of voice.  Pl.'s Dec. ¶ 62.  The sixth incident described by Plaintiff involved an e-mail message in October 20, 2010 (again this is less than a month after Plaintiff came back to work) where Micalizzi accussed Plaintiff of not submitting, electronically, his leave for time he was out.  This was a blatantly false accusation since Plaintiff had already completed the process and even sent Micalizzi a copy of it. See Def.'s Exh. H, US0419.  Pl.'s Dec. ¶ 63.  The seventh incident concerned a meeting between Micalizzi and Plaintiff on October 21, 2010 in Micalizzi's office (a day after incident six, and again within days of Plaintiff's return to work).  Pl.'s Dec. ¶ 64. At the meeting, Ms. Micalizzi wouldn't accept nor thought it relevant the amount of invoices that Plaintiff did resolve and again brought up her charges that the June WIP report was not completed in time (the report was completed in time).  Plaintiff stated that it was ridiculous because the criticism was unfair, at which point Micalizzi shot back 'you're ridiculous'.  At first Plaintiff sat there with his mouth open unable to respond.  Then Plaintiff asked 'are you calling me ridiculous?' and Micalizzi responded 'well you introduced the word into the conversation.'"

Exh. "B" p.202 Def.'s Exh. H., US0419.  Again, this report was already completed and was prepared by others.  Plaintiff's Decl. ¶ 64.

The eighth incident concerned a meeting between Micalizzi and Plaintiff on October 26, 2010.  At the meeting (again less than a month after Plaintiff's return), Micalizzi ordered Plaintiff to perform some work on invoices that would take 20 minutes per invoice to accomplish. She told Plaintiff that each invoice should only take 5 minutes. When Plaintiff asked how to complete them in that amount of time Micalizzi refused to answer and told Plaintiff that, "she would ask the questions." Exh. "A", ¶ 9 (8), Exh. "B", p. 211, Pl.'s Dec. ¶ 65.  Plaintiff then asked 'am not allowed to ask questions and Micalizzi shot back that [Plaintiff] is questioning her authority".

Plaintiff was also discriminated because when he came back to his job his training was cut off, and everything that was done during his training was taken against him as his fault, and no one supported him to provide him guidance or show him how to do things.  This was in an ongoing effort to harass him.  Exh. "B", p.196, Pl.'s Dec. ¶ 66-67.  As stated above, the discrimination and harassment started immediately after Plaintiff's return to work.  The constant harassment was so close together that it shows that it was closely connected with Plaintiff's disability and the fact that he was out of work for 3 months because of his injury.

Moreover, Plaintiff worked in the accounting office with approximately 6-7 people.  Exh. "B" p.75.  Among the people that worked with Plaintiff were Halima Khan, Bernard, Jeffrey Davis, Jing Cheng, Russell, another unidentified individual and Plaintiff. Exh. "B:"p. 78.  These employees were in the same position as Plaintiff, however they made mistakes for which no adverse action will occur, as opposed to Plaintiff's, since after Plaintiff complained formally, Micalizzi did everything in her power to terminate him.  See Exh. "A" ¶ 10-14.

**4. Defendant has not articulated legitimate non-discriminatory reasons for its actions since Plaintiff's performance deficiency is in dispute as Micalizzi wanted to terminate him after he took a leave of absence of 3 months due to his injury**

The VA has not articulated legitimate non-discriminatory reasons for Plaintiff's termination. The termination reasons are pretextual. At the very least material issues of fact exist as Plaintiff disputes the termination reasons. Therefore, summary judgment cannot be granted. See Graham v. Long Island R.R., 230 F.3e 34, 39 (2d Cir. 2000).

On April 13, 2011, Plaintiff was terminated for pretexual reasons as a result of the Defendant's discriminatory practices. Exh "A" ¶ 9 (9), Defendant's Exh. "L" and "M". The stated reasons were as follows and are pretextual to mask a discriminatory and retaliatory intent: (a) Plaintiff was counseled regarding allegedly making several errors that were found in the Work in Progress reconciliation and that he continued to make numerous errors which were found in both December 2010 and January 2011 reconciliations and (b) Plaintiff was counseled regarding his responsibilities in assisting Fund Control Point users in resolving issues with their transactions and that he allegedly provided incorrect advise. Exh "A" ¶ 11.

Regarding the Work in Process (WIP) report, data entry errors were subsequently corrected. Halima Khan, Jing Chen and Jeffrey Davis (Not Disabled) all admitted to data entry errors but were never disciplined to plaintiff's knowledge. The errors occurred for the first time when Plaintiff entered this information in the GL system, however, Plaintiff did not make these errors after that time. Further, Plaintiff had just returned from his disability leave and was working with Chrisa Perdikogiannis on the monthly WIP report discussed in the January 7, 2011 memorandum. The Work in Process report is reviewed and signed off by the Project Managers of each project before it is issued. All discrepancies that they bring up, if any, are resolved before issuance. In the case of project completion dates, these could only be changed by contract

modifications. The report reflected the contract dates even if past due. These discrepancies were also brought to the attention of the Project Managers. It should be noted that the report balance was not affected since both the credit and invoice balance both appeared in the report. In no case was capitalization of a project affected. Thus, the reasons proffered are pretextual to mask a discriminatory and retaliatory intent.  Exh "A" ¶ 12.

Regarding providing incorrect advice, the OLCS report is a listing of invoices that have not been certified for payment. Plaintiff's responsibility was to contact the user and have them either certify the invoice for payment or work with them to resolve any issues. When a budget issue precludes payment, Plaintiff asks the user to contact the budget department for resolution. He could also suggest a different Fund Control Point (FCP), but only as a suggestion.  The user may want or need further clarification on this point from the Budget department. The FCP, Plaintiff suggested was wrong and the user, Margery Carazzone did follow up with Budget Department. Plaintiff spoke to Ms. Carrazzone about this after the resolution and it was agreed that the problem was worked out satisfactorily. Plaintiff subsequently worked with Ms. Carazzone on other issues after this and they were on a friendly basis. These types of OLCS problems happened on an almost daily basis including Halima Khan, Jing Chen, Elena Ruzin (who to Plaintiff's knowledge were never disciplined). Put simply, Plaintiff tried to guide the users but in no case could he make the decision. Thus, Plaintiff was treated disparately and the incident was blown grossly out of proportion and is being used as another pretext to mask defendant's discriminatory and retaliatory intent. Exh "A" ¶ 13.  After Plaintiff left, Halihma Kahn who was not criticized like Plaintiff for making the same mistakes, was promoted into the position his position. Exh. "C" p. 76.

For the foregoing reasons, material issues of fact exist regarding Defendant's alleged legitimate non-discriminatory reasons to terminate Plaintiff and therefore Summary Judgment cannot be granted.

**5.   Plaintiff disputes the contents of his termination letter.**

Plaintiff disputes all the contents of his termination letter as his file was built up by Defendant in an effort to terminate him due to his disability.   Defendant's reasons to terminate Plaintiff are pretextual.   See POINT II, sec. 4 and Plaintiff's Responses to Rule 56.1.

On February 25, 2011 Angela Micalizzi sent a memo to Deborah Innella, Chief, Human Resources, with the subject line Request for Termination.   See Def.'s Exh. "L" (February 25, 2011 memo from Angela Micalizzi, Assistant Chief, Fiscal Service, to Deborah Innella, Chief HRMS, re Request For Termination, Bates US0165-66, the "Request to Terminate"). Specifically, Micalizzi requested that Nadel be terminated during his probationary period due to his alleged "failure to properly perform his duties and unsatisfactory performance".   In the letter, Micalizzi described specific errors that she believed Nadel made when Nadel prepared the December 2010 Work in Process reconciliation.   For instance, the letter stated "630a4-09-402 - An amendment was processed on September 16, 2010 to increase PO C00536 to 188,495.22. The current WIP report did not reflect the amendment." However, Plaintiff disputes this false allegation which was used to terminate him.   See Plaintiff's Responses to Rule 56.1 Responses 48-52.   Specifically, Plaintiff contends that the December WIP report was prepared in February or March of 2011. Therefore the contents do not correspond for the Jan 7th, 2011 Counseling Memo. If AM means the WIP due in December 2010, then that would be the September WIP. This report was maintained by someone else during Plaintiff's absence. When Plaintiff brought this up at numerous meetings, he was told he owned this report now.   Thus, the reasons stated

were a pretext to terminate him.  The Request to Terminate Plaintiff further stated the following about another task performed by Nadel:   "630a4-1 0-436 - PO C80463 was incorrectly listed under project number 630A4-10-436; it belongs to project 630a4-08-420." Defendant's Ex. L, at US0165.   However, Plaintiff denies this false allegation because it was another pretext to terminate him.  Specifically, the allegation refers to an FY 08 project, this means that it was entered by someone else, not Plaintiff.  Further, the Request to Terminate accused plaintiff of submitting an erroneous WIP report which does not reflect the amendments." Defendant's Ex. L, at US0165.  With respect to Plaintiff contends the allegations as his performance was satisfactory and further the January 2011 WIP was prepared in April and that he was blamed for errors of others. See POINT II, sec. 4.  The Request to Terminate also stated:   "630-06-108 – that erroneous payments of $40,641.60 are listed on the January 2011 Work-in-process. The correct payments amount should total $45,947.50." Defendant's Exh. L, at US0165.    The recommendation further pinpoints other alleged errors which Plaintiff denies. Plaintiff believes that the alleged error may be caused due to a Project that reopened and a payment was made after an amendment. Again this is for the January 2011 WIP, which was prepared in April, 2011. Further, Plaintiff's was provided with no training after he came back from his injury and despite this his performance was satisfactory.  Plaintiff was being criticized for errors committed during his first 8 weeks of training and given responsibility for errors in the reports that were prepared at the time that he was out due to his disability.  Pl.'s Dec. ¶60-98.  Thereafter Plaintiff was terminated.  In the Letter of termination, Defendant states Nadel is being terminated for the following reasons which Plaintiff has above established are merely a pretext for discrimination:

> A. By memorandum dated January 7, 2011, you were counseled regarding several errors that were found in the Work in Progress (WIP) reconciliation. However, you failed to properly perform your duties in that you continue to make numerous errors which were found in both December 2010 and January 2011 reconciliations.

B. By memorandum dated January 7, 2011, you were also counseled regarding your responsibilities in assisting Fund Control Point (FCP) users in resolving issues with their transactions. As an operating accountant, you are expected to be competent in resolving issues related to their transactions. In your e-mail to Ms. Margery Carazzone on February 24, 2011, you provided incorrect advice and again demonstrated that you are not performing satisfactorily in your duties."

For the foregoing reasons, material issues of fact exist regarding Defendant's alleged legitimate non-discriminatory reasons to terminate Plaintiff and therefore Summary Judgment cannot be granted.

## POINT III

### PLAINTIFF WAS RETALIATED AGAINST FOR COMPLAINING OF DISABILITY AND PERCEIVED DISABILITY DISCRIMINATION.

To establish a *prima facie* case of retaliation, an employee must show `[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995)). The Mc Donnel Douglas burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII. The same standards and burdens apply to claims of retaliation in violation of the ADEA. Schnabel, 232 F.3d at 87 (stating that ADEA claims are analyzed under the same framework as claims brought pursuant to Title VII).

Here Plaintiff had participated in protected activity as he  complained of discrimination via EEOC complaint and the Defendant was aware of this activity; Plaintiff was subjected to an adverse employment action because he was harassed and discriminated after Defendant found out that he was disabled and ultimately terminated and there is a causal connection between the harassment, discrimination and termination as Plaintiff's performance was satisfactory and

23

Defendant's behavior changed abruptly as soon as Micalizzi found out that Plaintiff was disabled and thereafter when he came back to work up to the time he was terminated.

Specifically, on November, 2010, Plaintiff made a complaint with the EEOC.  Shortly after complaining, (there was also a mediation in December 2010) on January 7, 2011, Angela Micalizzi issued a written counseling memo to Plainntiff regarding my performance.  See Defendant's Exh. K (Memo from Angela Micalizzi, Acting Chief, Fiscal Service, to Larry Nadel re Written Counseling, Bates US0093-94 the "Counseling Memo").  In the memorandum, Plaintiff was blamed for errors that he did not make and also for a report which was prepared while he was not working.  The allegations in the memorandum were just pretexts in order to terminate Plaintiff and mask Defendant's retaliatory reasons to terminate Plaintiff.  Pl.'s Dec. ¶52-69.  Plaintiff received a warning letter from Micalizzi in January 2011.  At that point, Plaintiff knew that this was a direct response for his complaint and that it was only a matter of time for Micalizzi to fill his personnel file with falsities to use to terminate him.  Exh. "B", p. 215.  In fact, after his complaint, Plaintiff started to have meetings with Micalizzi which he described as unpleasant because Micalizzi was very accusatory both verbally and with her body language. Plaintiff was never given the benefit of the doubt.  Exh. "B", p. 238.  At these meetings, Micalizzi would raise her voice, yelled at Plaintiff and end the meetings by yelling at Plaintiff "dismissed" or "get out!".  Exh. "B", p. 240.  Plaintiff felt very humiliated by this hostile treatment.  On April 13, 2011, Plaintiff was terminated for pretexual reasons as a result of his protected activity.  Exh "A" ¶ 9 (9), Defendant's Exh. "L" and "M".  See POINT III, sec. 5.

Moreover, the termination letter was based on the counseling memorandum and Plaintiff disputes every single allegation in the letter.  All the reasons stated are false and were pretextual.  Pl.'s Dec. ¶ 67-98. Therefore, the conduct described was done intentionally and based on

Plaintiff's disability, perceived disability and in retaliation.  Exh "A" ¶ 14.  Lastly, Plaintiff indicated that the incidents listed in the complaint were just some examples of a larger problem and that he was subjected to abusive and hostile work environment treatment.  Id.  Due to Defendant's actions, Plaintiff has been unable to secure a job and has been unemployed since his termination despite his multiple attempts to find other employment.  Due to the discrimination and retaliation, Plaintiff is depressed and has trouble sleeping.  Exh "B" p.262-267, p. 275.

For all these reasons, at the very least material issues of fact exist regarding Plaintiff's retaliation claims and therefore summary judgment cannot be granted.

## <u>CONCLUSION</u>

For all the above reasons, Plaintiff respectfully request that defendant's motion for Summary Judgment be denied in its entirety and for any other relief that is just and equitable.

Dated: New York, New York
      February 25, 2014                       Respectfully submitted

                                           <u>s/Stewart Lee Karlin</u>
                                           STEWART LEE
                                         NATALIA KAPITONOVA
                                         Attorney for Plaintiff
                                         9 Murray Street, Suite 4W
                                         New York, NY  10007
                                         (212) 792-9670